[Crim. No. 1848. First Appellate District, Division Two.—February 19, 1936.]

THE PEOPLE, Respondent, v. W. H. GREGORY, Appellant.

Ames Peterson for Appellant.

U. S. Webb, Attorney-General, Seibert L. Sefton, Deputy Attorney-General, Earl Warren, District Attorney, and J. H. Coakley, Deputy District Attorney, for Respondent.

SPENCE, J.—Defendant Gregory and five other persons were charged by indictment with certain violations of the Corporate Securities Act. There were ten counts in the indictment. The first five counts charged grand theft against all defendants except defendant Gregory. The second five counts charged all of the defendants, including defendant Gregory, with violations of the Corporate Securities Act. Defendants Cox and Weatherill were found guilty on all ten counts. Other defendants were found guilty on certain counts and not guilty on others. Defendant Gregory was found guilty on all five counts on which he was charged. Defendant Gregory alone prosecutes this appeal from the judgment of conviction, the order denying his motion in arrest of judgment and the order denying his motion for a new trial.

The sixth count of the indictment read as follows: "And the said James E. Cox, R. K. Weatherill, Jessie M. Gibbs, Henry Steiner, J. E. Soderholm and W. H. Gregory are further accused by the Grand Jury of the County of Alameda by this sixth count of this Indictment of a felony, to-wit, a violation of an Act of the Legislature of the State of California, approved May 18, 1917, Statutes of 1917, page 673 as amended, and known as the Corporate Securities Act, committed on-or about the 25th day of November, 1931, in the said County of Alameda, State of California, in the manner following, to-wit:

"That the said James E. Cox, R. K. Weatherill, Jessie M. Gibbs, Henry Steiner, J. E. Soderholm and W. H. Gregory did, on or about the 25th day of November, 1931, in the said

County of Alameda, State of California, wilfully, unlawfully and knowingly authorize, direct and aid in the issue and sale of, and did issue, execute and sell, and cause and assist in causing to be issued, executed and sold for value to Gladys E. Jones a security of their own issue, as defined in said Corporate Securities Act, to-wit, a certain unit certificate of interest and participation in a certain contract dated April 15, 1929, beween James E. Cox and R. K. Weatherill, without having first applied for and secured from the Commissioner of Corporations of the State of California a permit authorizing them so to do.

"And the acts described in the sixth count of this Indictment and the acts described in the first count of this Indictment were part of the same act, transaction and event."

The seventh, eighth, ninth and tenth counts of the indictment contained similar charges. These were the five counts upon which defendant Gregory was tried and convicted.

Upon the trial, the district attorney stated in his opening statement that the prosecution proposed to show "that those offenses charged in the indictment and other similar or related offenses were committed by these defendants and by others who were agents and servants of these defendants in the course of and in furtherance of a general conspiracy, the common unlawful purpose of which was to obtain money from the public by fraudulent and false representations, and by an unlawful sale of interests, called unit certificates in a certain alleged contract between the defendant James E. Cox and R. K. Weatherill, which contract pertained to the promotion of an organization ostensibly designed to sell or market a formula or process for the treatment of crude oil, and later by the unlawful sale of stock in the Cox Process Corporation".

The reporter's transcript is a voluminous one consisting of 4,029 pages, but in view of the fact that defendant Gregory concedes the guilt of the remaining defendants, the statement of facts here may be confined to a brief outline of the general plan under which said defendants operated, followed by a *résumé* of the testimony relating to defendant Gregory's connection therewith.

In 1929, defendant Cox claimed to have developed a new process for "dehydrating and decarbonizing crude oil". He and defendant Weatherill entered into a written agree-

ment. Said agreement was in the form of a letter signed by defendant James E. Cox and his wife, Lillie E. Cox, which letter was endorsed as accepted by R. K. Weatherill under date of April 15, 1929. It recited the discovery of the process, the ownership of a lease covering an oil shale deposit from which "Cox Chemical" was obtained, and the need of capital. It gave defendant Weatherill the right to purchase all rights in the "Cox Chemical" and the lease upon certain conditions. Defendant Weatherill was to begin erection of a plant within a specified time, the cost of which plant was not to exceed $150,000. He was to organize a corporation to take over "Cox Chemical", the lease, the plant and the equipment. One-fourth of the entire capital stock of the corporation was to be issued to defendant Cox and his wife. The remaining provisions are unimportant in this discussion.

Between 1929 and April, 1933, receipts or unit certificates were sold and issued to the general public without any permit from the corporation commissioner. They were written on the letterhead of "R. K. Weatherill, Suite 924 Security Title Insurance Building, Los Angeles", and read as follows:

"Received of ......................................
"Address ......................................
"City of ...................State of ...................
"Amount ..........................Dollars
"($......) FOR AND IN CONSIDERATION of an undivided........................of one per cent interest in that certain contract dated April 15th, 1929, a copy of which is hereto attached and made a part hereof, in which JAMES E. COX and the undersigned are the parties, said contract referring especially to a certain chemical discovered by the said JAMES E. COX for use in de-hydrating and de-carbonizing crude oil.

"This receipt is not transferable.
"(Signed) R. K. WEATHERILL"

The sales were made to the general public in California and elsewhere. In 1933 the Cox Process Corporation was incorporated in Nevada and a stock transfer office was established in Reno. Letters were sent to all unit certificate holders asking them to surrender their unit certificates for stock and practically all unit holders made such exchange. This continued from April, 1933, to September, 1934, without any permit from the commissioner of corporations. New sales

were likewise made. An attempt was made to evade the provisions of the Corporate Securities Act by issuing large blocks of stock to certain defendants and then transferring such stock to the investors.

An extensive sales campaign was conducted throughout the five-year period from 1929 to 1934. The prosecution claimed that these sales exceeded $1,000,000 and defendant Gregory concedes that the evidence showed that said sales exceeded $700,000. During this entire period, the office was located at "Suite 924, Security Title Insurance Building, Los Angeles". This office was the principal place of business from which the correspondence was sent covering the sales campaign. The sales force centered its activities there and the unit certificates were mailed from that address. The only other office was the one established in Nevada in 1933 for the sole purpose of the issuance of the stock of the Nevada corporation.

The grand theft charges in the indictment were based upon obtaining money under false pretenses during the sales campaign. We need not set forth the numerous false representations made. Defendant Gregory concedes that the evidence showed "that the whole process was conceived in fraud by Cox" and further concedes as to defendant Weatherill that "the perusal of the transcript indicates beyond the peradventure of a doubt that he was guilty of the charges brought against him". For the purposes of this discussion, it is sufficient to state that the evidence conclusively shows that all of the defendants other than defendant Gregory were actively engaged in the sales campaign which involved a gigantic scheme to cheat and defraud the public through the sale, by false representations, of securities representing interests in a wholly worthless process. We find no evidence to show that defendant Gregory personally sold any securities and it may be assumed that it was for this reason that defendant Gregory was not charged with grand theft, but only with violating the Corporate Securities Act.

We may now proceed to a brief summary of the evidence relating to defendant Gregory. For a number of years prior to his conviction, said defendant lived and practiced law in Los Angeles. He admits that he acted as attorney for defendant Weatherill and that there was a close association between them during the period in question. He further

admits that he drew the contract which was attached to the receipt or unit certificate and also the form of the receipt or unit certificate. The evidence shows that in 1929 he and defendant Weatherill went to Hayward to look over the land and to negotiate with defendant Cox. According to defendant Weatherill, defendant Gregory was the one who "drew up the whole set-up" and "handled all the legal affairs" for several years thereafter. This was not denied by defendant Gregory.

As above stated, the business, which consisted almost entirely of selling these receipts or unit certificates, was handled from the suite at 924 Security Title Insurance Building. Donald McKenzie, since deceased, was one of the salesmen and he personally sold unit certificates amounting to $300,000. He and others worked in and from said office. All orders for unit certificates went through said office. Defendant Gregory occupied this suite with defendant Weatherill and others. The name Cox Process Company was on the door. The names of defendant Gregory and others likewise appeared upon the door. Defendant Gregory admits that during at least part of the five-year period in question, his office rent was paid by defendant Weatherill and that he received approximately $2,500 in fees from said defendant. The unit certificates were typed in the office above mentioned and were there delivered to purchasers or prepared for mailing. In some instances these unit certificates were backed with blue legal backing paper upon which was printed defendant Gregory's name. There was a common reception room for said suite and the same stenographer who did the stenographic work in connection with the issuance of the unit certificates also did the work of defendant Gregory. There was also testimony showing that defendant Weatherill had promised defendant Gregory and certain salesmen to give them an interest in the organization. This appears to be admitted in some of defendant Gregory's correspondence.

We will not attempt to set forth the contents of defendant Gregory's correspondence with certain defendants and with certain investors. This correspondence and the other evidence above set forth conclusively show that said defendant's claim that he did not know that the unit certificates were being sold to the public cannot be given weight. Said evidence clearly shows that defendant Gregory prepared

and otherwise aided in the issuance of said securities with knowledge that said securities were to be sold to the general public in the state of California and elsewhere. This was all that was required to sustain his conviction on the offenses with which defendant Gregory was charged.

The testimony of the deputy corporation commissioner is also significant. He testified that in June, 1931, stop orders were sent to defendant Gregory and others ordering that the sale of interests in the Cox Chemical Company be discontinued. Defendant Gregory admitted before the grand jury that he had received this notice. The deputy further testified that a week later he had a conference with defendant Gregory in which defendant Gregory acknowledged that unit certificates were being sold to the public but claimed that the document was not a security and that no permit was necessary. No such claim is now made and we need not discuss the point further than to state that the receipt or unit certificate was clearly a "security" within the meaning of the Corporate Securities Act. The deputy further testified that defendant Gregory then stated that "they had particularly designed this method of handling the situation in order to avoid the regulations or investigation and that that particular receipt form had been designed by him for the purpose of avoiding the necessity of submitting this plan and process and the method of operation to the commissioner of corporation's office". The deputy advised defendant Gregory that the receipt or unit certificate was a security and each sale made without a permit would constitute a violation of the act. However, it does not appear that defendant Gregory or any of the other defendants paid any attention to the stop order or the advice of the deputy commissioner. The sales campaign continued until shortly before the defendants were indicted in 1934.

On this appeal, appellant's first assignment of error is "Error in conducting contempt proceedings in the presence of the jury during the testimony of G. O. Peterson and error in connection with proposed stipulation." ██ The contempt proceeding was one in which the trial court found counsel, who was then representing appellant, guilty of contempt for acts committed in open court and imposed a fine of $50. It is not claimed that the acts of counsel were not contemptuous or that the trial court did any more than de-

clare counsel in contempt and impose the fine. Immediately thereafter and without any request, the trial court fully admonished the jurors that they should entirely disregard the contempt proceeding, that it had nothing to do with the merits of the case and that they should not be prejudiced against any of the defendants by reason of the proceeding. No authority is cited by appellant to show that it was error under the circumstances to conduct the contempt proceeding in the presence of the jury, and we know of none. In fact, there are numerous authorities to the contrary. (*People* v. *Johnson,* 219 Cal. 72 [25 Pac. (2d) 408]; *People* v. *Beitzel,* 207 Cal. 73 [276 Pac. 1006]; *People* v. *Tinnin,* 136 Cal. App. 301 [28 Pac. (2d) 951]; *People* v. *Santos,* 134 Cal. App. 736 [26 Pac. (2d) 522]; *People* v. *Frank,* 132 Cal. App. 360 [22 Pac. (2d) 792].) We therefore conclude that said claim of error may not be sustained. ■ The second alleged error relates to a request made in open court for a stipulation. The district attorney requested a stipulation to the effect that appellant's signature appeared on a certain letter. The asking for the stipulation was assigned as prejudicial misconduct. Thereafter the signature was identified as that of appellant's and, so far as we can ascertain, there is no evidence to the contrary. While we do not believe it to be proper practice for the prosecution to request stipulations in open court in a trial on a criminal charge, we find nothing prejudicial in the incident to which reference has been made.

■ It is next claimed that there was "Error in admitting against appellant evidence of an alleged conspiracy." Appellant points out that there was no conspiracy charged in the indictment and that the prosecution was permitted to offer proof of an alleged conspiracy. We find no merit in this point for the admission of evidence of a conspiracy has been repeatedly sanctioned in this state even in the absence of a charge of conspiracy in the indictment. (*People* v. *Ferdinand,* 194 Cal. 555 [229 Pac. 341]; *People* v. *Coffelt,* 140 Cal. App. 444 [35 Pac. (2d) 374]; *People* v. *Sampsell,* 104 Cal. App. 431 [286 Pac. 434]; *People* v. *Wilson,* 76 Cal. App. 688 [245 Pac. 781]; *People* v. *Anderson,* 59 Cal. App. 408 [211 Pac. 254]; *People* v. *Murphy,* 53' Cal. App. 474 [200 Pac. 484]; *People* v. *Correa,* 44 Cal. App. 634 [186 Pac. 1055]; *People* v. *Schmidt,* 33 Cal. App. 426 [165 Pac. 555]; *People* v. *Ford,* 25 Cal. App. 388 [143 Pac. 1075].)

■ Appellant's next point, "Error in holding that appellant was ever a member of any conspiracy", is closely related to the discussion which has preceded. Turning back to the indictment, we find that there were five counts of grand theft and five counts violating the Corporate Securities Act. The grand theft charges were based upon obtaining money by false pretenses through the issuance and sale of certain securities to certain persons. The charges of violating the Corporate Securities Act were based upon the issuance and sale of the same securities to the same persons. The testimony as to all counts necessarily covered the issuance and sale of said securities. It may be assumed for the purpose of this discussion that the evidence was insufficient to show that appellant entered into a conspiracy to commit grand theft but there is no doubt that it was ample to show that he entered into a conspiracy to violate the Corporate Securities Act. Appellant was charged only with such violations and not with grand theft. He was convicted only of such violations and as the evidence clearly sustains his conviction, it becomes unnecessary to set forth evidence relating to the conspiracy. It may be stated, however, that the existence of a conspiracy need not be proved by direct evidence that the parties actually met together and agreed to undertake the performance of an unlawful act. (*People* v. *Schmidt*, 33 Cal. App. 426 [165 Pac. 555] ; *People* v. *Correa*, 44 Cal. App. 634 [186 Pac. 1055].)

Appellant apparently concedes that the evidence was sufficient to show that he violated the Corporate Securities Act, but he speaks of "the scales hanging evenly in the balance". We cannot agree that the scales were hanging evenly as to the violations of the Corporate Securities Act but, on the other hand, we believe that the record conclusively showed, by admittedly competent evidence, that appellant was guilty of such violations. We therefore will not discuss certain assignments of error in the admission of evidence. We have examined these assignments and are of the opinion that the error, if any, in admitting the evidence to which reference is made could not have been prejudicial to appellant.

■ Appellant also claims "Error in the closing argument of the district attorney". In support of this claim, appellant has set forth a substantial portion of said argument. It is

entirely apparent therefrom that the district attorney was making certain statements in response to the arguments made on behalf of the defendants. The transcript does not set forth any portion of the arguments on behalf of defendants as required by section 7 of rule II of the Rules for the Supreme Court and District Courts of Appeal. Under these circumstances, this court might well refuse to consider this assignment of error. (*People* v. *Lawyer,* 1 Cal. App. (2d) 1 [35 Pac. (2d) 1036]; *People* v. *James,* 133 Cal. App. 751 [24 Pac. (2d) 859]; *People* v. *Bragdon,* 103 Cal. App. 20 [283 Pac. 881].) ▆ We have nevertheless examined the closing argument of the district attorney and while we cannot place the stamp of approval on all that was said, we are of the opinion that there was nothing therein which would warrant a reversal of the judgment against appellant. We again point out that appellant was charged solely with certain violations of the Corporate Securities Act. These charges were conclusively proved and we are convinced that none of the alleged errors resulted in a miscarriage of justice.

The judgment and orders appealed from are affirmed.

Nourse, P. J., and Sturtevant, J., concurred.